1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERTO HERRERA,                          No. 2:12-cv-00508 DAD

12            Petitioner,

13        v.                                    ORDER

14   CONNIE GIPSON,

15            Respondent.

16

17        Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on September 9, 2010 in the Lassen County Superior Court on charges of

20   battery by a prisoner on a non-confined person and possessing and carrying a sharp instrument

21   while confined in a penal institution.  He seeks federal habeas relief on the grounds that his guilty

22   plea was involuntary and he was denied the effective assistance of trial and appellate counsel.

23   After conducting an evidentiary hearing with respect to the claims presented and upon careful

24   consideration of the entire record and the applicable law, the undersigned will deny petitioner's

25   application for federal habeas corpus relief.

26   **I.  Standards of Review Applicable to Habeas Corpus Claims**

27        An application for a writ of habeas corpus by a person in custody under a judgment of a

28   state court can be granted only for violations of the Constitution or laws of the United States.  28

U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

holdings of the United States Supreme Court at the time of the last reasoned state court decision.

Greene v. Fisher, 565 U.S. ___, ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852,

859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court

precedent "may be persuasive in determining what law is clearly established and whether a state

court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606

F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen

a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme]

Court has not announced."  Marshall v. Rodgers, 569 U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013)

(citing Parker v. Matthews, 567 U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be

used to "determine whether a particular rule of law is so widely accepted among the Federal

Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further,

where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is

"clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77

(2006).

/////

1    A state court decision is "contrary to" clearly established federal law if it applies a rule

2    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

3    precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

4    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

5    writ if the state court identifies the correct governing legal principle from the Supreme Court's

6    decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Lockyer v.

7    Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

8    (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court

9    concludes in its independent judgment that the relevant state-court decision applied clearly

10   established federal law erroneously or incorrectly.  Rather, that application must also be

11   unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

12   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

13   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

14   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

15   'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

16   Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

17   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

18   must show that the state court's ruling on the claim being presented in federal court was so

19   lacking in justification that there was an error well understood and comprehended in existing law

20   beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

21       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

22   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

23   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

24   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

25   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

26   considering de novo the constitutional issues raised.").

27       The court looks to the last reasoned state court decision as the basis for the state court

28   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

1   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

2   previous state court decision, this court may consider both decisions to ascertain the reasoning of

3   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

4   federal claim has been presented to a state court and the state court has denied relief, it may be

5   presumed that the state court adjudicated the claim on the merits in the absence of any indication

6   or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

7   may be overcome by a showing "there is reason to think some other explanation for the state

8   court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

9   (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but

10  does not expressly address a federal claim, a federal habeas court must presume, subject to

11  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. ___,

12  ___, 133 S. Ct. 1088, 1091 (2013).

13         Where the state court reaches a decision on the merits but provides no reasoning to

14  support its conclusion, a federal habeas court independently reviews the record to determine

15  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

16  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

17  review of the constitutional issue, but rather, the only method by which we can determine whether

18  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

19  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

20  reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

21         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

22  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

23  just what the state court did when it issued a summary denial, the federal court must review the

24  state court record to determine whether there was any "reasonable basis for the state court to deny

25  relief."  Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

26  have supported, the state court's decision; and then it must ask whether it is possible fairminded

27  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

28  decision of [the Supreme] Court."  562 U.S. at 102.  The petitioner bears "the burden to

4

1    demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v.</u>

2    <u>Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

3         When it is clear, however, that a state court has not reached the merits of a petitioner's

4    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

5    habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

6    F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

7    **II.  Petitioner's Claims**

8              **A.  Involuntary Guilty Plea**

9                    **1.  Procedural Background/Statement of Claims**

10        Petitioner characterizes his first claim for federal habeas relief as being based on the

11   assertion that the challenged conviction was obtained through the use of a coerced "confession."

12   A review of the relevant facts alleged, however, reflects that petitioner is actually claiming that

13   his entry of his guilty plea in state court was involuntarily.[1]

14        Petitioner alleges as follows.  He was involved in a "physical incident" at High Desert

15   State Prison (HDSP), which resulted in criminal charges being filed against him in the Lassen

16   County Superior Court for possession of a sharp prison-made instrument and battery on a prison

17   guard.  (ECF No. 1 at consecutive p. 6.)[2]  Petitioner was then transferred out of HDSP because of

18   the nature of his alleged crime – assault on a correctional officer.  However, he was later returned

19   to HDSP during the criminal proceedings in state court.[3]  Upon his return to HDSP he was

20   exposed to prison staff who were either involved in the "incident" with which petitioner was

---

21   [1]  In his pro se petition, petitioner complained that he no longer possessed the exhibits supporting

22   this claim because he had not been allowed access to the prison law library.  He explained that those exhibits were attached to the habeas petitions he filed in the state courts.  Accordingly, and

23   in any event, in addressing this claim this court has reviewed the exhibits attached to the habeas petitions filed by petitioner in the Lassen County Superior Court and the California Supreme

24   Court.  (<u>See</u> Resp't's Lod. Docs. 4, 5, 7.)

25   [2]  Page number citations such as this one are to the page numbers reflected on the court's

26   CM/ECF system and not to page numbers assigned by the parties.

27   [3]  As became clear at the evidentiary hearing, during the period of time in question the Lassen

     County Superior Court had trailer outfitted as a courtroom on the grounds of HDSP for purposes

28   of conducting court proceedings involving HDSP inmates.

1    charged or were friends and associates of the alleged victim of the assault, a prison staff member.

2    (Id.)  Because of the nature of the charges pending against petitioner (i.e. battery on a prison

3    guard), petitioner claimed he "was being threaten (sic) harassed in so many ways by several

4    H.D.P. officials (IGI B. Flemming and several others) in persuing (sic) the case to trial." (Id.)

5    Petitioner attempted to file a prison grievance regarding the issue but his inmate appeal was not

6    processed by the prison.  (Id.)  Petitioner then filed a petition for writ of habeas corpus in the

7    Lassen County Superior Court requesting a transfer to another prison but, according to petitioner,

8    the Superior Court simply forwarded that petition to his trial counsel unfiled and informed

9    petitioner that "counsel was the only person that could file documents regarding issues that

10   pertain to the case." (Id. at 6-7.)

11          Petitioner alleged that as a result of the situation he described, he was "forced to try to

12   plea (sic) guilty." (Id. at 7.)  Petitioner stated that he told the Lassen County Superior Court

13   Judge that he was being "forced/pressured to do so," and that as a result the court refused to

14   accept his plea under those circumstances.  (Id.)  Because of what he characterized as his "safety

15   concerns from H.D.P. officials," petitioner again tried to plead guilty but the court again refused

16   to accept his plea.  (Id.)  At that point, petitioner's trial counsel told the court that he intended to

17   file a motion to have petitioner transferred out of HDSP.  (Id.)  However, his counsel never filed

18   such a motion.  (Id.)  According to the allegations of the petition, petitioner felt "pressured/

19   coerced/intimidated to plea (sic) guilty to the charges no matter what it took." (Id.)  To that end,

20   petitioner falsely told the judge during the plea colloquy that the "threats harassments by H.D.P.

21   officials were made up and that I [petitioner] am not being pressured to plea (sic) guilty to the

22   charges and will sign guilty plea documents (although petitioner was in fact pressured to do so) so

23   that the court will take petitioner's guilty plea." (Id. at 7-8.)  However, before he entered his

24   guilty plea, petitioner handed his counsel a "handwritten declaration . . . indicating why and how

25   petitioner is being pressured to plea (sic) guilty" and kept a copy for his records.  (Id. at 8.)

26          The record reflects that on September 9, 2010, petitioner did plead guilty to the charges on

27   the third occasion he appeared for a change of plea hearing in the Lassen County Superior Court

28   and was sentenced immediately, as he requested, to two concurrent terms of 25 years to life in

1  prison, to be served consecutively to the life sentence he was already serving.  (Reporter's

2  Transcript on Appeal (RT) at 26, 52.)  On October 2, 2010 petitioner requested a certificate of

3  probable cause with respect to that issue, but that request was denied by the trial court without

4  comment.  (Clerk's Transcript on Appeal (CT) at 48.)

5          On April 26, 2011, petitioner's appellate counsel filed an opening brief on appeal in the

6  California Court of Appeal pursuant to People v. Wende, 25 Cal. 3d 436 (1979) in which he set

7  forth the facts of the case and requested that the state appellate court review the record and

8  determine whether there were any arguable issues on appeal.  (Resp't's Lod. Doc. 3.)  On May 9,

9  2011, petitioner, proceeding without counsel, filed a supplemental brief on appeal arguing, among

10  other things, that he had been pressured to plead of guilty as a result of threats by prison staff at

11  HDSP.  (Resp't's Lod. Doc. 4.)

12          On June 15, 2011, while his appeal was still pending before the California Court of

13  Appeal, petitioner filed a habeas petition in the Lassen County Superior Court.  (Resp't's Lod.

14  Doc. 7.)  Therein, he claimed that his guilty plea was involuntary.  He also claimed that his trial

15  counsel had rendered ineffective assistance in failing to file a motion to have him transferred out

16  of HDSP to another institution during the pendency of the criminal proceedings in the Lassen

17  County Superior Court, and in failing to preserve the issue of the voluntariness of his plea,

18  thereby preventing his appellate counsel from raising that issue on appeal.  (Id.)  Petitioner

19  attached as an exhibit to this state habeas petition the declaration, described above, that he had

20  handed his counsel, noting on the record that he was doing so, at the third change of plea hearing

21  when his guilty plea was finally accepted.  (Id.)  The Superior Court denied habeas relief by order

22  dated July 28, 2011, stating only that "[t]he petition raises an issue that should have been raised

23  on direct appeal and is dismissed.  (In re Dixon (1963) 41 Cal.2d 756, 759.)"  (Resp't's Lod. Doc.

24  8.)

25          The California Court of Appeal affirmed petitioner's judgment of conviction on August 2,

26  2011.  (ECF No. 24-1.)  That court rejected petitioner's supplemental argument that his guilty

27  plea was involuntary on the procedural grounds that he had failed to obtain a certificate of

28  probable cause and found no other arguable grounds for relief.  The state appellate court

1  reasoned, in full, as follows:

2      This case comes to us pursuant to People v. Wende (1979) 25
       Cal.3d 436.  Having reviewed the record as required by Wende, we
3      affirm the judgment.  We provide the following brief description of
       the facts and procedural history of the case.  (See People v. Kelly
4      (2006) 40 Cal.4th 106, 110, 124.)

5      Defendant Roberto Torres Herrera was serving a life sentence for
       murder.   While in prison, he was charged with one count of
6      possessing a sharp instrument (Pen. Code, § 4502, subd. (a)) and
       one count of being a prisoner and committing a battery on someone
7      not a prisoner.  (§ 4501.5.)  As to both counts it was further alleged
       defendant had suffered four prior strike convictions.   (§ 667,
8      subds.(b)-(i.).)

9      On May 6, 2010, defense counsel indicated defendant wanted to
       enter into a "straight up" plea; however, defendant refused to sign
10     the plea form because he claimed he had been threatened and
       intimidated into entering the plea.  The court made clear that if
11     defendant stated he had been coerced into entering the plea, the
       court could not and would not accept the plea.  Defendant then
12     informed the court his case involved a battery on correctional
       officers.   Those officers had threatened that his cell would be
13     "tossed up," his paperwork and legal things thrown out, and he
       would not receive medical attention.  He was tired of the threats and
14     just wanted the case to end.  In view of defendant's statements, the
       court stated it could not take a plea under the circumstances.  At the
15     next hearing, defendant again indicated he wanted to enter a plea
       and repeated his claim of intimidation.  The court again refused to
16     accept the plea on that basis.

17     At the trial readiness conference in September 2010, defendant
       advised the court he wanted to enter an open plea, "no offers, no
18     deals, no nothing."  He stated he was not being pressured and had
       fabricated the claims of retaliation and harassment.   Defendant
19     agreed to sign the plea form and waive preparation of a probation
       report.  Defense counsel and defendant met and went over the form
20     together.   Defendant specifically initialed the part of the form
       indicating he was not under the compulsion of any threats or force.
21     During the advisements prior to taking the plea, the court
       specifically reiterated the question about entering the plea under
22     duress and defendant reaffirmed he was not under duress.
       Defendant again waived time, insisting he wanted to be sentenced
23     immediately.   The plea and sentencing time waiver were done
       without defense counsel's consent, as he believed defendant should
24     file a Romero motion.  The court explained to defendant that a
       successful Romero motion could reduce his sentence.  Defendant
25     reiterated his desire to be sentenced immediately.  Defendant pled
       guilty to all counts and admitted the enhancement allegations.
26     Defendant was sentenced to 25 years to life on counts I and II,
       concurrent to each other and consecutive to his currently imposed
27     sentences.   A $200 restitution fine was imposed under section
       1202.4(b).  Defendant's request for a certificate of probable cause
28     was denied.

Appointed counsel set forth the facts of the case and requested this court to review the record and determine whether there are any arguable issues on appeal. (People v. Wende, supra, 25 Cal.3d 436.) Defendant was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief.

Defendant filed a supplemental brief, again claiming he was pressured into entering the plea by the threats and harassment of the correctional officers. Defendant's claims are challenges to the validity of the plea. Such challenges cannot be raised without a certificate of probable cause. (People v. Mendez (1999) 19 Cal.4th 1084, 1098–1099; People v. Panizzon (1996) 13 Cal.4th 68, 74–75.)

Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

DISPOSITION

The judgment is affirmed.

People v. Herrera, No. C066207, 2011 WL 3300160 (Cal. Ct. App. Aug. 2, 2011).

In addition to these facts, as recited by the California Court of Appeal, the following facts appear from the record of petitioner's trial proceedings. During the hearing at petitioner's second attempt to change his plea, his counsel did in fact inform the court that petitioner wanted counsel to file a motion seeking an order transferring him back to CSP-Corcoran during the pendency of the criminal proceedings in Lassen County Superior Court. (RT at 34.) The court set a hearing date for that motion. (Id.) Defense counsel informed the court that petitioner wanted the motion for a transfer to be heard "at the earliest possible time." (Id. at 36.) Counsel also advised the court that he was in possession of evidence suggesting that petitioner's outgoing legal mail had been opened, read by prison staff, and not placed in the mailbox in a timely manner. (Id. at 37.) The trial court expressed its displeasure if that was the case and told petitioner's counsel to include those facts in his transfer motion. (Id.)

During the third hearing held in connection with petitioner's attempts to change his plea, at which time the trial court accepted his guilty plea, petitioner informed the court that his motion seeking a transfer to another prison during the pendency of these criminal charges had never been heard. (Id. at 43.) As he alleges, the transcript reflects that petitioner also stated on the record

9

that he had a declaration he wanted to give his trial counsel and that he was going to keep a copy of this declaration for his own records.  (Id.)  Petitioner did not describe the contents of that declaration on the record, nor did the judge ask to see or inquire about its contents.[4]

At that same change of plea hearing the record reflects that petitioner declined to review the plea form with his counsel, stating, "I'll sign right now, I'll sign whatever the DA wants me to sign," and "I want to get this done, that's it, I'm tired, okay."  (Id. at 45.)  However, the judge insisted that petitioner and his counsel meet in private to review and initial the plea form.  (Id. at 45-46.)  When the judge asked petitioner whether he wanted a hearing pursuant to the decision in People v. Romero, 13 Cal. 4th 497 (1996), petitioner stated, "No, I just want to get sentenced right now.  I don't want no hearing, no nothing, no nothing, just sentenced right now."  (Id. at 49.)  When petitioner was asked by the judge whether he understood that his minimum sentence could be "zero" but that his maximum sentence could be "fifty to life," petitioner replied, "I'll take the max, middle, max."  (Id.)  Immediately after the judge accepted his guilty plea, petitioner asked the court whether his trial counsel, or the judge, could assist him in filing an appeal.  (Id. at 53.)[5]

### 2. Subsequent Procedural Background

On October 26, 2011, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, claiming that his guilty plea was involuntary.  (Resp't's Lod. Doc. 5 at 3-6.)  He also claimed that his trial counsel rendered ineffective assistance in: (1) failing to file a motion to have petitioner transferred to another facility during the trial proceedings, thereby forcing

[4]  In that declaration, which is part of the record before this court, petitioner again declared under penalty of perjury that after his return to HDSP to face the state charges of assaulting staff he "was being threaten (sic), harassed in so many ways by staff" and "was pressured to plea (sic) guilty."  (Resp't's Lod. Doc. 4 at consecutive pp. 2-3.)  Petitioner further declared that he was going to "lie to the court solely so that the court will accept my guilty plea by stating to the court harassment, threats by H.D.S.P. were made up by me and I'm not being pressured to take guilty plea and will sign guilty plea documents so that I be finished with case be transferred back to prison I come from."  (Id. at 3.)  Petitioner explained that he would hand this declaration to his attorney in open court and keep a copy of it for himself, and that he would ask his trial counsel to assist him with filing an appeal "so that I can appeal my guilty plea."  (Id.)

[5]  Petitioner also stated at that time that he had filed "a civil suit" and had some tape recordings to be used "as evidence."  (Id. at 54.)  The sentencing judge ordered that all evidence be "preserved in the current status."  (Id.)

1   petitioner to plead guilty under duress; (2) failing to "withdraw" petitioner's guilty plea even

2   though he knew petitioner was pleading guilty as a result of coercion by prison staff; and (3)

3   failing to obtain a certificate of probable cause with regard to petitioner's claim that his guilty

4   plea was involuntary, thereby preventing such a claim from being pursued on appeal.  (Id.)

5   Petitioner also claimed that his appellate counsel rendered ineffective assistance in failing to

6   obtain a certificate of appealability so that he could challenge his guilty plea on appeal.  (Id.)

7   Petitioner included as an exhibit to that state habeas petition the affidavit that he had given to his

8   trial counsel at the change of plea hearing, described above.  That petition was summarily denied

9   by order dated February 29, 2012.  (Resp't's Lod. Doc. 6.)

10      Petitioner commenced the instant action by filing his federal habeas petition in this court

11   on February 27, 2012.  Petitioner filed a supplement to his petition on March 15, 2012.

12   Respondent filed an answer on June 12, 2012, and petitioner filed a traverse on September 24,

13   2012.  On December 14, 2012, counsel was appointed by this court to represent petitioner in these

14   federal habeas proceedings.  A status conference was held on February 8, 2013.  At the

15   conclusion of that status conference, the parties were directed to file supplemental briefs

16   addressing whether an evidentiary hearing should be held on any of petitioner's claims.

17   Petitioner filed his supplemental brief on May 7, 2013.  Respondent filed supplemental briefs on

18   May 9, 2013, and June 24, 2013.

19      On January 23, 2014, the undersigned issued an order setting an evidentiary hearing on

20   petitioner's claim that his guilty plea was coerced by threats and harassment and was therefore

21   not voluntarily entered.  That evidentiary hearing was held on October 19-20, 2015.

22      On December 28, 2015, petitioner filed a motion to "reopen" the evidentiary hearing in

23   order to permit additional discovery and additional testimony in light of information contained in

24   certain exhibits attached to petitioner's motion to reopen.  That motion was denied by order dated

25   January 15, 2016.

26                    **3.  Evidence Introduced at Evidentiary Hearing**

27      At the evidentiary hearing before this court held on October 19-20, 2015, testimony from

28   the following witnesses was presented:  petitioner's state court trial counsel Ray Simmons;

1   Superior Court Judge Charles Hayden; HDSP Correctional Officer Matthew Flemming; and

2   petitioner himself.  Below, the court will summarize the relevant testimony provided by each of

3   those witnesses and indicate which testimony the court found to be credible.

### a.   Attorney Ray Simmons

5          Petitioner's counsel in the underlying criminal proceedings before the Lassen County

6   Superior Court was Ray Simmons.  Attorney Simmons testified as follows.  After petitioner was

7   charged with assaulting a correctional officer at HDSP, he was transferred to another prison but

8   was then transferred back to HDSP in order to face the criminal charges that had been brought

9   against him.  (Reporter's Transcript of Evidentiary Hearing, at 11.)  On May 6, 2010, the trial

10  judge refused to accept petitioner's guilty plea because "the underlying evidence was that the

11  defendant had been threatened so he was just entering a plea, and if that was what the defendant

12  was claiming, the judge wouldn't take the plea."  (Id. at 14.)  Petitioner had previously made the

13  similar claims of harassment to Simmons and his investigator during meetings they had at the

14  prison.  (Id. at 14-15.)  However, petitioner refused to name for his attorney the officers he

15  alleged were involved in his harassment.  (Id. at 16.)

16         Petitioner did tell Simmons that "a tray of food had been dropped outside his cell."  (Id.)

17  Petitioner also stated that the harassment "related to the underlying case and his willingness to go

18  to trial."  (Id.)  At one point during a meeting with his attorney in January of 2010 petitioner said

19  that he had been "stomped on," that "CDC refused to give him legal documents," and that "staff

20  violated procedures."  (Id. at 86.)  As always, however, petitioner refused to name the

21  correctional officers allegedly involved in these activities and failed to provide any details to

22  support his claims, suggesting only that if he did so "it could result in him getting injured."  (Id. at

23  86, 116.)  Petitioner was never specific about what he claimed correctional officers had said or

24  done to him, but rather avoided answering such questions.  Simmons, however, believed that

25  petitioner was generally suggesting that if he testified at his trial "something would happen to

26  him."  (Id. at 17-18.)

27         Although petitioner refused to provide any specifics, attorney Simmons nonetheless

28  investigated the matter by contacting the correctional officers who were "on shift" where

12

1    petitioner was incarcerated, but was unable to talk to any of them.  (Id. at 22-23.)  Simmons also

2    contacted two correctional officers who had given him confidential information in the past.

3    Those correctional officers confirmed to Simmons that an incident had occurred when a

4    correctional officer had thrown a tray of food on the ground in front of petitioner's cell.  (Id. at

5    40, 95-96.)  However, the officers were not willing to testify or to supply names.  (Id. at 40.)

6    When Simmons asked the two correctional officers if they had heard anything about petitioner

7    being physically harassed, they responded, "I don't know or not that I'm aware of."  (Id. at 97.)

8    Attorney Simmons explained that petitioner:

9    
> Tells me a version of things that transpired involving him and the
> officers, declines to say who the officers are.  I investigate it.  I
10   > can't find anything that specifies that this happened.

11   (Id. at 50.)

12          Attorney Simmons ultimately did not file a motion seeking petitioner's transfer out of

13   HDSP because petitioner would not give him sufficient information to support such a motion.

14   (Id. at 26, 63-64.)  Simmons told petitioner that if petitioner would not provide more specific

15   information Simmons could not file a motion for transfer because in his experience to do so

16   would be a waste of time.  (Id. at 30, 67-68.)  Nonetheless, petitioner refused to even explain to

17   Simmons why he would not provide him with the names of the officers who were allegedly

18   harassing him.  (Id. at 68.)

19   
> So I said look, you come in here and first you told me that they did
> some things to you but you won't tell me who it is – you won't tell
20   > me the officers.  You don't tell – you won't tell me when it
> happened.  You won't tell me specifically except for the dropped
21   > tray.

22   > So how am I supposed to gather any of this information, put it into
> a motion of some sort and have it heard by a judge, and it's Judge
23   > Hayden who'll hear your motion when he's already told me,
> Simmons, you need a lot more than that.  So give me something,
24   > anything.  And he wouldn't do it.

25   (Id. at 131.)[6]

26   

27   _____

28   [6] Petitioner eventually filed his own motion for a transfer but, as described above, it was returned
     by the court to petitioner's attorney.  (Id. at 31.)

1    On the day his guilty plea was accepted by the trial court, attorney Simmons had prepared

2    a statement for petitioner to sign indicating that he, petitioner, had "made up" the story about

3    being harassed by correctional officers.  (Id. at 49-52.)  Simmons prepared this statement for

4    petitioner's signature because he knew that the trial judge would not accept petitioner's guilty

5    plea if petitioner persisted in his vague claims that he had been harassed by correctional officers.

6    (Id. at 51.)  Although petitioner told Simmons that his claims of harassment by prison guards

7    were "made up," he nevertheless declined to sign the statement to that effect.  (Id. at 47-50, 51.)

8    At the change of plea hearing, petitioner told the judge he had a declaration and was going

9    to give it to his counsel.  (Id. at 52.)  The court recessed the proceedings so that petitioner could

10    discuss that declaration with attorney Simmons.  (Id.)  During the break, Simmons read the

11    declaration and told petitioner that the judge would not accept his guilty plea if he knew the

12    declaration persisted in the claim that he was being forced to plead guilty.  (Id. at 52-53, 105.)

13    Petitioner told attorney Simmons that he wanted to go back to Corcoran and again stated

14    regarding the claims of harassment that he had "made it up." (Id. at 104.)  When Simmons asked

15    petitioner whether he was telling the truth when he stated that he had made up his allegations

16    about being harassed, petitioner replied to him, "I'm telling the truth." (Id. at 136.)

17    Although he was not satisfied with petitioner's response, attorney Simmons did not advise the

18    trial judge of his concerns because he had "been told in the past that if a defendant wants to plead

19    guilty you don't have to have permission of your attorney."  (Id. at 106.)

20    Although he was dissatisfied with petitioner's inconsistent statements to him about

21    whether he had been subject to any harassment by prison guards, attorney Simmons did not

22    believe that petitioner's decision to plead guilty was induced by "threats," nor did he believe that

23    petitioner had been "seriously threatened, intimidated and harassed leading up to his change of

24    plea." (Id. at 106-07.)[7]  Rather, attorney Simmons believed that petitioner was engaging in

25    "manipulative behavior" when he waved his declaration in the air at the change of plea hearing.

26    (Id. at 88.)  According to attorney Simmons:  "What I thought was going on was I thought that the

27    _____

28    [7] Specifically, attorney Simmons described his client's behavior in this regard as "a bunch of bull." (Id. at 106.)

1  defendant was bs-ing me, that there may have been some harassment of him,[8] [but] that he

2  wanted to get back to Corcoran . . . ." (Id. at 108-09.)  Simmons simply did not believe that his

3  client was "credible when he claimed that it was only because of harassment was the reason he

4  was pleading guilty." (Id. at 110.)  As attorney Simmons noted, petitioner had never articulated

5  any details of the alleged harassment whatsoever. (Id. at 61,111-12.)  On the other hand,

6  petitioner had repeatedly said he wanted to be transferred to Corcoran (id. at 68) and also told

7  Simmons during this time that he needed to go back to Corcoran to "be with my guys" (id. at 109)

8  and that he had "business to take care of" at Corcoran. (Id. at 131.)  From this, Simmons formed

9  the impression that petitioner was more interested in being transferred to Corcoran than in simply

10 getting out of HDSP. (Id. at 79-80.)

11          The undersigned found attorney Simmons' testimony at the evidentiary hearing to be

12 credible in every respect.

13                              **b.  Petitioner Roberto Herrera**

14          Petitioner was called as a witness at the evidentiary hearing and testified as follows. (Id.

15 at 137.)  Petitioner asked his attorney, Simmons, to get him out of HDSP because he was being

16 harassed by prison guards. (Id. at 142.)  Petitioner didn't care whether he was sent back to

17 Corcoran or to another prison, he just wanted to get away from HDSP. (Id. at 140-01.)  Petitioner

18 claimed that he refused to identify the guards who were harassing him because he was

19 "intimidated" and felt he would be "beat up" in retaliation for naming them. (Id. at 142, 150.)[9]

20 Attorney Simmons told petitioner that he would file "some type of motion" to have him

21

_____

22 [8] For instance, attorney Simmons was convinced that the incident where a guard dropped or threw
   a tray of food in front of petitioner's cell had taken place and constituted harassment. (Id. at 62,
23 107.)  However, if attorney Simmons believed that his client had been threatened and harassed,
   was pleading guilty because of the threats and harassment but was going to lie to the court and
24 deny that at the change of plea hearing, he would have moved to withdraw and would not have
   participated in the fraud on the court. (Id. at 109.)  Attorney Simmons did not believe that was
25 the case here and therefore did not move to withdraw as petitioner's counsel but instead went
   forward with the plea. (Id.)
26

27 [9]  At the evidentiary hearing petitioner identified correctional officers Fleming, Wheeler, Quiseda,
   and one other officer as those who were harassing him at HDSP prior to his change of plea. (Id.
28 at 141.)

1  transferred to a different prison, but never did so.  (Id. at 143.)  Simmons explained to petitioner

2  that courts looked on motions to transfer with disfavor because "a lot of inmates just claim to be

3  harassed, retaliate (sic) by staff just to try to get a little bit more freedom . . . ."  (Id. at 144.)

4  Simmons also told petitioner that the local jail did not want to take inmates from maximum

5  security prisons and that Corcoran was located too far away from Lassen County to allow

6  Simmons to have effective communication with petitioner about his criminal case if he were

7  transferred there.  (Id. at 145.)  Petitioner tried to file an inmate grievance but prison officials

8  refused to process it.  (Id. at 148.)  He also filed a motion seeking a transfer to a different

9  institution on his own.  (Id. at 148-49.)

10       When asked at the evidentiary hearing the type of harassment which he had allegedly

11  experienced leading up to his change of plea, petitioner testified only to the following:

12       Well, my legal mail, it would come open.  It would come already
13       opened like they read it or something.  Sometimes I would try to
     mail out some legal mail and then I ask staff, they would – they
14       would just keep on walking, or I'll go to like say the court or to the
     yard and my cell would be all messed up like all my photos thrown
15       on the floor.  All different kinds of things, threats and retaliation.

16  (Id. at 146.)  Upon further questioning by his habeas counsel, petitioner then recalled that there

17  was "this one time" when he felt correctional officers Flemming, Wheeler and, he thought,

18  Quisada or Quisela indicated that they would beat him up if he took the stand in his own defense

19  at a trial on the assault charge.  (Id. at 146-47; see also id. at 187-88.)  When asked by his habeas

20  counsel how many times this had occurred, petitioner's reply was again vague:

21       Well at least they said it once, those individuals that are named.
     But there was other staff that had threatened me about it, but I don't
22       remember the names or nothing like that.

23  (Id. at 148.)  Finally, when pressed for details of this alleged threatened use of force against him,

24  petitioner testified only that while he couldn't "be specific" this claimed threat was made

25  "around" "mid-2010," in the administrative segregation unit referred to as Z Unit, and that no one

26  else was there other than an unnamed fourth correctional officer.  (Id. at 187-89.)  Petitioner

27  testified that he did not know which of the officers uttered the threat to beat him up, nor could he

28  identify the day of the week or the time of day that the alleged incident took place.  (Id.)

16

1    Petitioner testified that he told the Superior Court Judge he was being harassed because he

2    believed it might cause the court to order him transferred out of HDSP.  (Id. at 150.)  Petitioner

3    testified that when he originally complained to the state trial court about being harassed he was

4    not lying, but was lying when he later recanted those allegations.  (Id. at 152-54.)  He claimed

5    that he made the false recantation because he "didn't see no other option."  (Id. at 154.)  Petitioner

6    also testified that the trial judge told him he would not accept his guilty plea if it was given

7    "under duress" so he "figured I had to lie to him in order for him to take my guilty plea . . . ."  (Id.

8    at 160.)

9    On cross-examination, petitioner conceded that when he was housed at Corcoran he was

10   prescribed the drug Tramadol.  (Id. at 166.)  However, after he was returned to HDSP the medical

11   staff discontinued the Tramadol prescription.  (Id.)  Petitioner's claimed that the discontinuation

12   of the Tramadol caused his pain to return and that he filed grievances and lawsuits in an

13   unsuccessful attempt to get a prescription for Tramadol at HDSP.  (Id.)  Petitioner also conceded

14   that he had protested and filed inmate grievances and lawsuits regarding several other conditions

15   of his confinement at HDSP with which he was not satisfied.  (Id. at 167-83.)  Nonetheless,

16   petitioner denied that his reason for saying he was being harassed at HDSP was to "get back to

17   Corcoran and back to Tramadol" or back to Corcoran in particular.  (Id. at 167-68, 171, 186.)[10]

18   The undersigned found petitioner's testimony at the evidentiary hearing to be generally

19   not credible.  This determination was based on petitioner's demeanor while testifying, his obvious

20   interest in the outcome of this habeas action, the extent to which his testimony was cast into doubt

21   by the testimony of other witnesses, and his vague memory as it related to events he alleged took

22   place which were critical to the merits of his claim for relief.  In particular, the court notes that as

23   to the sole specific instance in which petitioner claimed to have been threatened with harm if he

24   went to trial and testified in his own defense, his evidentiary hearing testimony was woefully

25   [10]  Petitioner also testified that one aspect of his harassment at HDSP was the prison's failure to
26   provide adequate medical care, including thermal underwear.  (Id. at 168.)  Officials at Corcoran
     had granted his request and gave him thermal underwear.  (Id. at 178.)  Petitioner claimed
27   generally that medical staff at HDSP would not give him medical treatment after he was charged
     with assaulting a correctional officer.  (Id.)  Nonetheless, petitioner denied that his sole objective
28   in pleading guilty was to be returned to Corcoran.  (Id. at 186.)

17

1  vague.  He could not identify with any degree of specificity as to when this critical event even

2  occurred.  "Mid-2010" was the best he could muster.  Moreover, he could not even name the

3  correctional officer who he claimed uttered the alleged threat.  If this incident had taken place as

4  he claims, the court believes that petitioner would have a much more clear recollection of what

5  took place and when it occurred.

6                    **c.   Superior Court Judge Charles Hayden**

7         Superior Court Judge Charles Hayden, the trial judge who presided over petitioner's

8  change of plea hearings, testified at the evidentiary hearing as follows.  (Id. at 194.)  Judge

9  Hayden perceived petitioner's behavior to be "manipulative, both with me and with his attorney,

10  trying to conduct everything in his way."  (Id. at 209.)  With respect to petitioner's vague claims

11  of being harassed, Judge Hayden testified that "there were never any specifics."  (Id.)  He told

12  petitioner to put his complaints about harassment or not receiving his legal mail in a motion

13  seeking an order requiring that he be transferred out of HDSP.  (Id.)

14         With regard to the third change of plea hearing when petitioner told the judge he had not,

15  in fact, been harassed but simply wanted to plead guilty, Judge Hayden testified he believed that

16  "at last [petitioner] was telling the truth" and finally "coming straight."  (Id. at 210.)  Judge

17  Hayden felt petitioner's impatience to plead guilty was "genuine and I completely believed him

18  that he had made up the previous stories because there was no follow through, no evidence, no

19  nothing of any report."  (Id.)  He testified that petitioner "probably did want to get back to

20  Corcoran where he – he was familiar and he knew the system there and he just wanted to get back

21  . . . ."  (Id. at 211.)

22         With respect to petitioner's actions in waving a paper over his head at the third change of

23  plea hearing, Judge Hayden testified as follows:

24              It was fairly common for him.  I can't say he waved papers in every
                proceeding, but he wanted to involve himself more than what most
25              defendants can or do or whatever, and it might have been a request
                for a motion.  I have no idea what it was and I couldn't ask him.  It
26              wasn't my business to ask him what he was giving his attorney.  In
                fact, that would have been – I would have been reprimanded from
27              all angles and I said, "Well, here, let me see that paper you want
                your attorney to look at."  No, I – I can't do that – wouldn't do that.
28

1  (Id. at 212.)[11]  Judge Hayden testified that he truly believed at the time that petitioner was telling

2  him the truth when he said he had fabricated his allegations of harassment by prison guards.  (Id.

3  at 236, 238.)

4         The court found Judge Hayden's testimony to be credible.

5                    **d.  Correctional Officer Matthew Flemming**

6         Finally, correctional officer Matthew Fleming testified at the evidentiary hearing.  (Id. at

7  243.)  He testified that he never harassed, threatened, or mistreated petitioner in any way.  (Id. at

8  245.)  Officer Flemming testified that although he was not at work the day of the assault with

9  which plaintiff was charged, he was aware of the charges subsequently being brought against

10  petitioner for assault on prison staff.  (Id.)  He also acknowledged that the officers involved in

11  that incident were his friends and colleagues.  (Id.)  However, Flemming testified that he had no

12  interest in the outcome of petitioner's trial on those charges.  (Id. at 246.)  Officer Fleming also

13  denied that he had ever threatened to validate petitioner as a prison gang member if he went to

14  trial on the assaulting a correctional officer charge.  (Id. at 251.)

15        The court found officer Flemming's brief testimony credible.

16                **4.  Applicable Legal Standards/ Involuntary Guilty Plea**

17        As noted above, petitioner claims that his guilty plea was coerced and therefore

18  involuntary.  Due process requires that a guilty plea be knowing, intelligent and voluntary.  Brady

19  v. United States, 397 U.S. 742, 748 (1970); Boykin v. Alabama, 395 U.S. 238, 242 (1969);

---

20  [11]  Indeed, Judge Hayden testified that even if he had been presented petitioner's declaration on

21  the day he changed his, he still might have accepted the guilty plea.  (Id. at 228-29.)  The judge
    explained his reasoning as follows:

22

23              His demeanor was such that I – I completely believed him, and if he
                had this in his pocket as a gotcha' when it's over, I think at some
24              point we have to accept responsibility for what we say.  I believe
                that he was telling the truth when he said he lied on the prior
                occasions.  I think that he was planning a further – on setup for the
25              courts to start everything all over again and every – and it's
                something every prisoner in the whole country could do day after
26              day after day.  He could have done that and filed those motions.  He
                didn't.

27

28  (Id. at 229.)  The undersigned observes that there was an obvious alternative – decline to accept
    the guilty plea and proceed to trial as soon as possible.

19

1  United States v. Delgado-Ramos, 635 F.3d 1237, 1239 (9th Cir. 2011).  "It goes without saying

2  that a plea must be voluntary to be constitutional."  United States v. Kaczynski, 239 F.3d 1108,

3  1114 (9th Cir. 2001).  "The voluntariness of [a petitioner's] guilty plea can be determined only by

4  considering all of the relevant circumstances surrounding it."  Brady, 397 U.S. at 749.  Those

5  circumstances include "the subjective state of mind of the defendant . . . ."  Iaea v. Sunn, 800 F.2d

6  861, 866 (9th Cir. 1986).  Addressing the "standard as to the voluntariness of guilty pleas," the

7  Supreme Court has stated that:

8
9  > (A) plea of guilty entered by one fully aware of the direct
> consequences, including the actual value of any commitments made
> to him by the court, prosecutor, or his own counsel, must stand
10 > unless induced by threats (or promises to discontinue improper
> harassment), misrepresentation (including unfulfilled or
> unfulfillable promises), or perhaps by promises that are by their
11 > nature improper as having no proper relationship to the prosecutor's
> business (e.g. bribes).
12

13  Brady, 397 U.S. at 755 (quoting Shelton v. United States, 246 F.2d 571, 572 n. 2 (5th Cir. 1957)

14  (en banc), rev'd on confession of error on other grounds, 356 U.S. 26 (1958)).  See also North

15  Carolina v. Alford, 400 U.S. 25, 31 (1970) (noting that the "longstanding test for determining the

16  validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among

17  the alternative courses of action open to the defendant.'"); Doe v. Woodford, 508 F.3d 563, 570

18  (9th Cir. 2007).

19  Of course, "[a] guilty plea, if induced by promises or threats which deprive it of the

20  character of a voluntary act, is void."  Machibroda v. United States, 368 U.S. 487, 493 (1962).

21  See also United States v. Hernandez, 203 F.3d 614, 619 (9th Cir. 2000) ("A plea is 'involuntary'

22  if it is the product of threats, improper promises, or other forms of wrongful coercion."),

23  overruled on other grounds, United States v. Ferguson, 560 F.3d 1060 (9th Cir. 2009).  If a guilty

24  plea is induced by promises or threats that make it involuntary or if it is not an intelligent choice

25  among available alternatives, it is invalid.  See Alford, 400 U.S. at 31; Doe, 508 F.3d at 570; Iaea,

26  800 F.2d at 866; see also Brady, 397 U.S. at 750 ("[T]he agents of the state may not produce a

27  plea by actual or threatened physical harm or by mental coercion overbearing the will of the

28  defendant.")

1    In Blackledge v. Allison, 431 U.S. 63 (1977), the Supreme Court addressed the

2    presumption of verity to be given the record of plea proceeding when the plea is subsequently

3    subject to a collateral challenge.  While noting that the defendant's representations at the time of

4    his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his

5    plea, the court stated that, nonetheless, the defendant's representations, as well as any findings

6    made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral

7    proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity."

8    Blackledge, 431 U.S. at 74.  See also Marshall v. Lonberger, 459 U.S. 422, 437 (1983) (a plea is

9    presumed valid in habeas proceeding when the pleading defendant was represented by counsel);

10   Muth v. Fondren, 676 F.3d 815, 821 (9th Cir. 2012); Little v. Crawford, 449 F.3d 1075, 1081 (9th

11   Cir. 2006); Chizen v. Hunter, 809 F.2d 560, 561 (9th Cir. 1986).  "Absent clear and convincing

12   evidence to the contrary, a defendant is bound by the representations he makes under oath during

13   a plea colloquy." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992).[12]

14          **5. Analysis**

15          In the order setting the evidentiary hearing in this case, the undersigned determined that

16   petitioner's claim that his guilty plea was not voluntarily entered had not been addressed on the

17   merits in state court and, even assuming it had been, the decision of the state courts to reject that

18   claim was based on an unreasonable determination of the facts in light of the circumstances

19   surrounding petitioner's entry of his plea.  (ECF No. 60 at 10-14.)  The district judge who was

20   assigned to this case at the time agreed with that determination.  (ECF No. 77 at 12-18.)[13]

21   [12]  In the context of federal criminal prosecutions, courts have held that "it is the policy of the law

22   to hold litigants to their assurances" at a plea colloquy.  United States v. Marrero-Rivera, 124
     F.3d 342, 349 (1st Cir. 1997) (citations, internal quotation marks, and alteration omitted).

23   Likewise, federal courts have observed that a petitioner "should not be heard to controvert his
     Rule 11 statements in a subsequent . . . motion unless he offers a valid reason why he should be

24   permitted to depart from the apparent truth of his earlier statement[s]." United States v. Butt, 731
     F.2d 75, 80 (1st Cir. 1984).  Rather, "[w]hen a defendant says he lied at the Rule 11 colloquy, he

25   bears a heavy burden in seeking to nullify the process;" therefore "in the absence of extraordinary
     circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively

26   established." United States v. Lemaster, 403 F.3d 216, 221 (4th Cir. 2005) (quoting United States

27   v. Bowman, 348 F.3d 408, 417 (4th Cir. 2003)).

28   [13]  Thereafter, the undersigned was confirmed as a District Judge and the case was reassigned.

21

1    Accordingly, in this case AEDPA deference does not apply to the state court decision rejecting

2    petitioner's claim that his guilty plea was coerced and involuntary and this court will review that

3    claim de novo.  Stanley, 633 F.3d at 860; Reynoso, 462 F.3d at 1109; Nulph, 333 F.3d at 1056.

4         As set out above, there was a full and complete colloquy between the state trial judge and

5    petitioner at the time petitioner entered his guilty plea.  (RT at 47-49.)  Petitioner stated that he

6    wished to plead guilty to the charges against him and he waived his rights to a trial by jury, the

7    right to confront his accusers and his right against self-incrimination.  (Id. at 47.)  Petitioner

8    specifically confirmed to the judge that he was entering his guilty plea "freely and voluntarily"

9    and that although he had previously told the court he was under duress or stress, that was "not the

10   case at this time."  (Id. at 48.)  Petitioner also initialed each relevant section of the plea form

11   including the paragraph indicating that he was offering his plea "freely and voluntarily" and

12   assuring the court that "No one has made any threats, used any force . . . in order to convince me

13   to plead guilty."  (CT at 32.)

14        After a review of the entire record and especially in light of the testimony introduced at

15   the evidentiary hearing before this federal habeas court, the undersigned concludes that petitioner

16   has not met his burden of proving that his guilty plea was coerced and was not freely and

17   voluntarily entered.  See Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2003); Silva v.

18   Woodford, 279 F.3d 825, 835 (9th Cir. 2002) ("'[I]t is the petitioner's burden to prove his

19   custody is in violation of the Constitution, laws or treaties of the United States'" and that "burden

20   of proof must be carried by a preponderance of the evidence.") (quoting Snook v. Wood, 89 F.3d

21   605, 609 (9th Cir. 1996), and citing McKenzie v. McCormick, 27 F.3d 1415, 1419 (9th Cir.

22   1994)).  The evidence before this court falls considerably short of demonstrating the

23   "extraordinary circumstances" necessary to controvert petitioner's own statements at his change

24   of plea hearing to the effect that he had previously manufactured his allegations of harassment

25   and was now pleading guilty voluntarily.

26        The evidence presented to this court fairly establishes that on one occasion while he was

27   incarcerated at HDSP after he was charged with assaulting a correctional officer, a food tray was

28   thrown on the ground in front of petitioner's cell by prison staff.  However, petitioner has

1   presented no evidence that the incident induced an involuntarily guilty plea on his part. There is

2   no other credible evidence before this court that petitioner was harassed in any way.  In short,

3   petitioner has simply failed to present any credible evidence that harassment by prison guards at

4   HDSP caused him to plead guilty, rendering that plea involuntarily entered.[14]

5         It is true that petitioner repeatedly complained about harassment by prison guards both to

6   the trial judge and to his counsel.  However, petitioner never supported those vague and general

7   allegations with any details, such as the names of the guards harassing him or even a description

8   of the nature of the alleged harassment.  For instance, although petitioner claimed he was

9   threatened by prison guards at HDSP with harm if he testified at a trial regarding the alleged

10  assault on prison staff, he declined to substantiate that claim with details of any kind and refused

11  or was unable to even name the guard(s) who allegedly made the threat.  Petitioner's testimony at

12  the evidentiary hearing before this court was no more specific.  Rather, his claims of harassment

13  at the hands of guards at HDSP remained vague and entirely unsupported by any detail.  Other

14  than establishing the throwing down of a tray of food in front of his cell on a single occasion,

15  petitioner has presented no persuasive evidence that he was harassed or threatened in any way

16  prior to his change of plea.  Moreover, he has presented no evidence that this single act of

17  arguable harassment influenced his decision to plead guilty.

18        Petitioner's trial counsel and the trial judge both credibly testified that they believed

19  petitioner was telling the truth when he recanted his allegations of harassment and stated that he

20  was pleading guilty freely and voluntarily.  Both petitioner's trial counsel and the trial judge

21  believed that petitioner was attempting to manipulate the system, with the trial judge believing

22  that petitioner was doing so in order to have his guilty plea set aside in the state appellate courts.

23  This court was also unconvinced by petitioner's testimony at the evidentiary hearing that he

24  decided to plead guilty because of threats and harassment from correctional officers.  Nor did the

25  court find believable petitioner's testimony that he lied when he filled out the change of plea form

26  _____

27  [14]  Even if petitioner had presented credible evidence that his legal mail was opened and that he
    was subjected to unreasonable cell searches following his return to HDSP, which he has not, he
    has presented no persuasive evidence that his decision to enter a guilty plea was actually coerced

28  or influenced in any way by those alleged staff actions.

1  and told the trial judge he was pleading guilty voluntarily.  Petitioner has simply failed to

2  overcome the strong presumption that his representations at his third change of plea hearing were

3  true.[15]

4        Because petitioner has failed to demonstrate that his guilty plea was involuntarily

5  entered, he is not entitled to federal habeas relief on this claim.[16]

6        **B.  Ineffective Assistance of Counsel**

7        Petitioner also claims that his trial and appellate counsel rendered him ineffective

8  assistance.  He first argues that his trial counsel should have filed a petition for writ of mandate to

9  challenge the trial court's denial of his request for a certificate of probable cause on his

10  supplemental appellate claim that his guilty plea was involuntarily entered.  (ECF No. 1 at

11  consecutive pgs. 8-9.)  Petitioner contends that his trial counsel's failure to file the petition for

12  writ of mandate prevented him from raising this issue on appeal in state court.  (Id.)[17]  Petitioner

13  also alleges that his trial counsel told him he would file a petition for writ of mandate on his

14  behalf, instructing petitioner not to file his own petition, but then failed to do so.  (Id. at 9.)

15  Finally, petitioner claims that his appellate counsel rendered him ineffective assistance in

16  /////

---

17  [15]  The court notes that evidentiary hearing testimony also suggested several clearly plausible
18  bases for petitioner's desire to leave HDSP, including petitioner's desire to return to a prison
    where he might receive the pain medication and long underwear he wanted and to be incarcerated
19  with others in surroundings he obviously found more to his liking.  They suggest that comfort and
    petitioner's personal preference, rather than any true concern for his personal safety, played a role
20  in motivating petitioner to change his plea and request immediate sentencing in the hope of being
    transferred out of HDSP.  Of course, in considering petitioner's possible motivation in changing
21  his plea it must also be kept in mind that the record before this court establishes that at the time he
    was charged with assaulting a correctional officer, petitioner was already serving a sentence of
22  life imprisonment for murder and had suffered four prior strike convictions.

23

24  [16]  Much litigation and expense would have been avoided over the past five years if the superior
    court had at some point merely conducted a hearing, addressed petitioner's allegations and
25  evidence presented in support thereof and made factual findings as this court has now done.
    Given the record in this case the state courts' consistent reliance on procedural grounds rather
26  than a determination on the merits of the claim was, in the undersigned's view, unfortunate.

27  [17]  As set forth above, the California Court of Appeal rejected petitioner's supplemental claim that
    his guilty plea was involuntary on the procedural ground that he had failed to obtain a certificate
28  of probable cause on that claim.  (ECF No. 24-1.)

1    agreeing with his trial counsel that a petition for writ of mandate should not be filed.[18]  (Id.)

2            Exhibits filed by petitioner in support of his ineffective assistance claims reflect that on

3    November 12, 2010, petitioner's trial counsel sent a letter to Katherine Dashiell, an attorney at the

4    Central California Appellate Program, stating the following:

5                    Today, I received notice from Lassen Superior Court that
6                    defendant's Request For Certificate of Probable Cause was denied
                     by Judge Hayden on November 5, 2010.

7                    Based on information you provided in your faxed letter dated
8                    11/04/09, counsel must pursue a challenge to the trial court denial
                     of the request for a certificate by way of writ of mandate.  You
9                    opined that the petition for writ of mandate should be filed within
                     60 days from the date an application for certificate of probable
10                   cause was denied.  You advised me in your letter that the appellant
                     wants to challenge his conviction and challenge the trial court's
11                   denial of the request for probable cause.

12                   Accordingly, I intend to file with the court the writ of mandate on
                     or before January 4, 2011.

13   (Resp't's Lod. Doc. 5, Ex. "H2.")  On that same day, petitioner's trial counsel wrote petitioner a

14   letter stating, in relevant part:

15                   In light of recent circumstances relating to your in propria persona
16                   filing of documents, I suggest that you do not attempt on your own
                     to file the writ of mandate.  I shall to it within the statutory period
17                   and send you a filed/endorsed copy of the document.

18   (Resp't's Lod. Doc. 5, exhibit "H1.")

19           On January 14, 2011, petitioner's trial counsel wrote another letter to attorney Dashiell, in

20   which he explained the following:

21                   On November 12, 2010, I wrote to Mr. Herrera and informed him
22                   that I would file a writ of mandate within the statutory period and
                     forward an endorsed/filed copy to him.  Subsequently, you and I
23                   discussed in two telephone calls the issue of an inoperative notice
                     of appeal and the possible effect of a writ of mandate.  It appeared
24                   that the court's denial of a petition for certificate of probable cause
                     is probably inoperative as to an appeal review of the sentence
25                   because of the defendant's actions by personally striking out

26

27   _____

     [18]   Petitioner raised these claims for the first time in his habeas petition filed in the California
     Supreme Court.  (Resp't's Lod. Doc. 5.)  That petition was summarily denied.  (Resp't's Lod.
28   Doc. 6.)

paragraph 2a(1) on the Amended Notice of Appeal form.[19]

I also spoke with Peter Dodd, who is appointed by CCAP to represent defendant Herrera, regarding a possible appeal of Mr. Herrera's conviction after plea.   Mr. Dodd reviewed appropriate transcripts of pre-sentence hearings and the plea and sentence transcript.

We discussed the issue of a writ of mandate.   Because of the defendant's action pertaining to that paragraph on the Amended Notice of Appeal, Mr. Dodd an [sic] I agree that a writ of mandate would be ineffective as to the issue of sentence and is therefore unnecessary.   I understand that Mr. Dodd is still reviewing the issue pertaining to whether the plea was valid.
Based on my conversations with you and Mr. Dodd, and legal research, I am not going to file a Writ of Mandate as to the sentence issue.

(Resp't's Lod. Doc. 5, Ex. I) (emphasis in original).

In addition to these claims, petitioner also appears to be challenging in these proceedings his trial counsel's failure to file a motion to have him transferred out of HDSP to another prison pending trial on his assault allegations.

### 1. Legal Standards

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).   To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687.   Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal quotation marks omitted).   "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 562 at 104 (quoting Strickland, 466 U.S. at 687).   A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

---

[19]   The record reflects that petitioner initialed and struck the following language from the notice of appeal form: "This appeal is based on the sentence or other matters occurring after the plea that do not affect the validity of the plea. (Cal. Rules of Court, rule 8.304(b).)" (CT at 44.)

1   <u>Strickland</u>, 466 U.S. at 669.  <u>See also</u> <u>Richter</u>, 562 U.S. at 107 (same).

2          Reviewing courts must also "indulge a strong presumption that counsel's conduct falls

3   within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.  There

4   is in addition a strong presumption that counsel "exercised acceptable professional judgment in

5   all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing

6   <u>Strickland</u>, 466 U.S. at 689).  This presumption of reasonableness means that the court must "give

7   the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of

8   possible reasons [defense] counsel may have had for proceeding as they did." <u>Cullen v.

9   Pinholster</u>, 563 U.S. ___, ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and

10  alterations omitted).

11         Prejudice is found where "there is a reasonable probability that, but for counsel's

12  unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466

13  U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

14  outcome." <u>Id.</u>  "The likelihood of a different result must be substantial, not just conceivable."

15  <u>Richter</u>, 562 U.S. at 112.  A reviewing court "need not first determine whether counsel's

16  performance was deficient before examining the prejudice suffered by the defendant as a result of

17  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

18  lack of sufficient prejudice . . . that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

19         The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel.  <u>Smith v.

20  Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).  In

21  order to establish prejudice in this context, petitioner must demonstrate that, but for appellate

22  counsel's errors, he probably would have prevailed on appeal.  <u>Miller</u>, 882 F.2d at 1434 n.9.

23         **2. Analysis**

24         Petitioner allegations regarding his trial counsel's failure to file a motion seeking

25  petitioner's transfer from HDSP were explored at length at the evidentiary hearing conducted in

26  this matter.  Attorney Simmons explained that petitioner never provided him with sufficient

27  information to justify the filing of such a motion.  (Reporter's Transcript of Evidentiary Hearing

28  at 16-18, 26, 63-64.)  He also explained that he had been advised by several local judges that such

1    a motion for transfer would not be granted unless it contained significant detail about the nature

2    of the abuse being inflicted.  (Id. at 30, 67-68, 131.)  Indeed, petitioner conceded at the hearing

3    that he had not given his trial counsel detailed information about the alleged abuse.  (Id. at 182-

4    84.)  Under these circumstances, trial counsel's decision not to file a motion seeking an order

5    requiring his client's transfer from HDSP was not outside the "wide range of reasonable

6    professional assistance."  Strickland, 466 U.S. at 689.

7            With regard to petitioner's allegations about the petition for a writ of mandate, the record

8    reflects that petitioner's trial and appellate counsel discussed and researched whether to file such

9    a petition challenging the trial court's denial of a certificate of probable cause and decided that it

10   was not advisable, in part because of petitioner's own actions in striking out a paragraph on the

11   notice of appeal form.  Petitioner has failed to show that this decision by counsel was erroneous

12   or incorrect.  In addition, petitioner has failed to show that an appellate claim challenging his

13   entry of plea on the basis that it was coerced would have prevailed.  The court notes that the

14   opinion of the California Court of Appeal set forth all of the relevant facts about petitioner's entry

15   of plea and concluded that there was no "arguable error that would result in a disposition more

16   favorable" to petitioner.  Herrera, 2011 WL 3300160, at *2.

17           Because petitioner has failed to demonstrate either deficient performance on the part of his

18   trial or appellate counsel or prejudice, he is not entitled to federal habeas relief on his claims of

19   ineffective assistance of trial and appellate counsel.

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

28

**III.  Conclusion**

    Accordingly, for all of the reasons set forth above:

    1.  Petitioner's application for a writ of habeas corpus is denied on the merits.

    2.  Because this is not a case in which "reasonable jurists would find the district court's
        assessment of the constitutional claims debatable or wrong," <u>Slack v. McDaniel</u>, 529
        U.S. 473, 484 (2000), a certificate of appealability will not issue.  18 U.S.C. § 2253(c).

    3.  The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **March 31, 2016**                              _____

                                        UNITED STATES DISTRICT JUDGE